## Livingston *vs.* Freeland and others.

What lands are primarily chargeable with the payment of an annuity to a widow in lieu of her dower, directed by a decree in partition to be paid by the owners of the several parcels of the land partitioned; which decree does not specify the order in which the several parcels are to be charged; and where some of the parcels have been alienated to different purchasers, and are subject to incumbrances.

Where an annuity, in favor of the widow of the testator, in lieu of her dower in all the real estate devised to his children, was charged upon the real estate of such devisees generally, and one of such devisees subsequently conveyed a part of the lands devised to him, and the grantees executed the conveyance and covenanted therein to indemnify the grantor against the debts of the testator and to perform all of the obligations imposed upon him as such devisee; *Held*, that the grantor's proportionate share of the annuity to the widow was primarily chargeable upon the lands thus conveyed to such grantees.

And where the grantees subsequently reconveyed to the grantor a part of the same premises, with covenants of warranty and seisin ; *Held* that the residue of the premises, which remained in their hands after such reconveyance, was primarily chargeable with his share of the annuity; as between their subsequent grantees of such residue and the owner of the lands reconveyed by them to their original grantor.

Where the owner of a charge upon the lands of several persons, which charge is primarily chargeable upon the lands of one of them, with full knowledge of the equitable rights of the parties, releases the lands primarily chargeable, he will not be permitted to enforce his charge against the lands which are only secondarily liable.

The court of chancery, upon a mere petition in the original suit, cannot make a personal decree or order against a purchaser *pendente lite*, who is not a party to the suit, whereby property not in litigation in such suit can be affected. But to reach and affect such lands, a new or supplemental bill, against such purchaser, is necessary.

This case came before the chancellor upon an appeal, by Maria S. Bogardus, from a decretal order of the vice chancellor of the third circuit, overruling the exceptions to a master's report as to the part of the real estate mentioned in the decree in this cause, upon which a portion of the dower of the defendant Ann Eliza Freeland, mentioned in her petition, was properly chargeable under such decree, and the order in which the real estate upon which it was a charge should be sold to satisfy the arrears of dower.

Henry Livingston the elder, the first husband of the defendant Ann Eliza Freeland, died in November, 1828, leaving his

widow and eight infant children surviving him; among whom were Henry Livingston the younger, Herman Livingston, Emma now the wife of Alonzo Bogardus, and Catharine now the wife of J. S. Talbot. At the time of his death he owned two farms in Columbia county, called the homestead and Monell farms; and three-eighths of certain ore beds in Salisbury, in the state of Connecticut. He also owned lot No. 1 of the subdivisions of great lot No. 3 in Livingston's manor, in the county of Columbia, containing about 13,000 acres of land; including the Ancram farm and iron works and coal lands, which he specifically devised to his son Henry, and which embraced about 4500 acres of lot No. 1. By his will he gave all his real and personal estate to his wife during the continuance of her widowhood; and appointed her the guardian of his children. After her death or remarriage, he devised to his son Henry the homestead and Monell farms, the Ancram farm and iron works and coal lands, and his interest in the Salisbury ore beds, and to his other children the residue of his estate equally. And for the purpose of making an equal distribution of his real estate among all his children, he directed it to be appraised, and that if the part thereof specifically devised to Henry exceeded his share, he was to pay enough to the executors, for the other seven children, to make their shares equal to his, and if less, the other children were to make it up to him.

In 1833 the widow married W. H. Freeland, who died in 1837. Previous to his death, however, he and his wife applied to the court of chancery for her dower in the real estate of her first husband, and obtained a decree allowing her an annuity of $4000 out of the rents and profits of the estate, as and for her dower. In November, 1838, A. Bogardus and his wife mortgaged to J. P. Mesick and J. T. Best one-*eighth* of lot No. 1 of the subdivisions of great lot No. 3 in Livingston's manor, to secure the payment of $13,545. In January, 1841, Herman Livingston filed his bill in this cause, against his brothers and sisters, for the partition of the premises devised to him and his brothers and sisters, and to obtain payment of the excess in value of the property specifically devised to his brother Henry.

And his mother and the mortgagees of A. Bogardus and wife were also made parties to the suit, as having specific liens upon the premises of which partition was sought. On the 27th of November, 1841, the vice chancellor made a decree declaring the rights of the several parties accordingly; and declaring that Ann Eliza Freeland was entitled to be paid annually, out of the rents and profits of the whole of the real estate of which Henry Livingston the elder died seised, the sum of $4000, as and for her dower, pursuant to a decree to that effect made in July, 1835. Commissioners were also appointed to make partition of the testator's residuary estate among his children except Henry. And they were directed to appraise the real estate specifically devised to Henry, and also that devised to the other children of the testator, and to report the amount payable for owelty, according to the directions of the will.

In December, 1842, the complainant presented a petition, stating, among other things, that the commissioners had ascertained that the share of Henry greatly exceeded the shares of his brothers and sisters, that there were large outstanding claims against the estate; and against Mrs. Freeland, as the testamentary guardian of the children, incurred for their support and education. And a supplemental decree was thereupon made, authorizing the commissioners to sell a portion of the lands specifically devised to Henry, sufficient to equalize his share with those of the other children; for the purpose of paying such debts. A reference to a master was also directed, to ascertain the amount of the claims against the estate, and against the testamentary guardian, and to report which of the children were equitably chargeable therewith. The commissioners not being able to effect sales, in pursuance of this decretal order, and the defendant Henry Livingston having arrived at the age of twenty-one, an agreement was made between himself of the first part, and the complainant and A. Bogardus and J. S. Talbot of the other part, to obviate the necessity of having a sale to equalize his share and pay the debts. The substance of this arrangement was that Henry should convey to the complainant and Bogardus and Talbot the whole of the lands specifi-

cally devised to him by his father, except the homestead and
Monell farms, so that the coal lands might be partitioned among
the other seven children, for the purpose of equalizing the sev-
eral shares; the grantees giving him back a mortgage for $7000
on the Ancram iron works, including 70 acres of the Ancram
farm; and covenanting, to indemnify him against the debts of
the estate and the claims of the other residuary devisees of his
father.   In pursuance of this arrangement, on the 8th of July,
1843, Henry Livingston and his wife conveyed to Herman Liv-
ingston, A. Bogardus and J. S. Talbot, the Ancram farm and iron
works, and the coal lands and his interest in the Salisbury ore
beds.   And they gave him back a mortgage for $7000, upon
the Ancram iron works, including 70 acres of land at and around
the same.   They also gave him a covenant to pay every
claim, charge or demand which the other children and heirs of
his father had against him, or his share of the estate, on ac-
count of the excess in the value of his share; and to indemnify
him against the debts of the estate and the debts of his mother
as testamentary guardian, and that they would perform all the
obligations imposed upon him as the devisee of a specific por-
tion of his father's real estate.   The court sanctioned this ar-
rangement, in behalf of the other children.  And with the consent
of the grantees a decretal order was made, on the 8th of August,
1843, directing the commissioners to partition the lands thus con-
veyed, except the Ancram iron works including the 70 acres, and
about 95 acres of the Ancram farm on the west side of the creek.
And the appraisal was then to be made for equality and the
owelty decreed, in the same manner as if these additional lands
to be partitioned among the residuary devisees of the testator had
been a part of the lands devised to them; the grantees of Henry
Livingston the younger being substituted as the persons who
were to receive or pay the sum allowed for owelty.  That decre-
tal order further directed that the share of each of the children
and heirs, and the homestead and the Monell farms, devised to
Henry, should be severally charged with an equal part of the
dower of the widow, and that such shares, except the home-
stead and Monell farms, should respectively be charged with

the debts provided for in the agreement. In September of the same year, A. Bogardus and wife mortgaged to Stephen Gunn their interest in the land devised to Mrs. B. by her father, including the interest which she or her husband derived to lot No. 1 of the subdivisions of great lot No. 3, under the deed from her brother Henry; to secure the payment of $5000. And on the 17th of November thereafter Bogardus and wife, and Talbot and wife, conveyed to Herman Livingston the 95 acres of the Ancram farm lying west of the creek, with covenants of warranty and seisin, and that the same were free from incumbrances. On the 18th of November, 1843, Herman Livingston and wife, A. Bogardus and wife, and J. S. Talbot and wife, conveyed the Ancram iron works and the 70 acres to Henry Livingston, with covenants of seisin and warranty, and against all incumbrances. And in March, 1844, Henry Livingston conveyed the same premises to Walter Shaffer, under whom J. D. Tanner, and J. Hall subsequently derived title to two-thirds of those premises. The homestead farm and the Monell farm were conveyed by Henry Livingston and wife to Herman Livingston, on the 18th of November, 1843, subject to the dower right of his mother, and also subject to the payment of a mortgage upon those two farms for $10,000, given to J. S. Rosevelt on the 9th of September in the same year; and subject to other liens and incumbrances specified in the deed. And in the summer of 1844, Herman Livingston sold and conveyed his interest in the Salisbury ore bed, to Chittenden, who was not a party to this suit.

This was the state of the title to the several parcels of land which were subject to the charge of the widow's dower, as well as of the lands of which partition was sought in this cause, at the time of the final decree therein on the first of November, 1844. Previous to that decree the commissioners had made partition between all the children of Henry Livingston the elder, except Henry, not only of the lands of which partition was sought by the bill in this cause, but also of the coal lands, containing 4312 acres, which were a part of the premises specifically devised to Henry Livingston the younger, and by him conveyed to Herman Livingston and to A. Bogardus and J. S.

Talbot previous to the decretal order of August, 1843. And the master, to whom the subject had been referred by a previous order of the court, reported in favor of a compromise between the devisees and the widow of the testator, by which she agreed to accept an annuity of $1500 from the 2d of August, 1842, in lieu of the $4000 per annum, which had been allowed her by a decree of the court; to be received by her in full satisfaction of all claims of the devisees against her. By such final decree the reports of the commissioners and of the master were confirmed. And the shares set off to the seven children, in severalty, were by such final decree each charged with the payment of one-eighth of the annuity, of $1500, to Mrs. Freeland. And the shares of the premises allotted to Herman Livingston, Bogardus and wife, and Talbot and wife, and also the interest which the testator originally had in the Salisbury ore beds, the Ancram iron works, and 70 acres of land at and around the same, and 95 acres of the Ancram farm west of the creek were charged with the payment of the remaining eighth of such annuity, which would have been chargeable upon the property specifically devised to Henry Livingston the younger, if the conveyance of July, 1843, and the decretal order of the 8th of August in the same year had not been made. The decree further directed that if either of the seven children, between whom the partition was made, or the husbands of the daughters who were married, should at any time fail to pay Mrs. Freeland any part of the annuity with which they were charged on their own account, or with which Herman Livingston, A. Bogardus and James S. Talbot were charged as the grantees of Henry Livingston the younger, she should be at liberty to apply to the court, upon the foot of the decree, for the sale of the premises charged with the payment of the part of the annuity which was unpaid.

The debts due were apportioned in the same manner; and were charged upon the same portions of the property, as subsequent charges to the annuity to Mrs. Freeland for her dower.

After the decree, and previous to July, 1846, Herman Livingston conveyed three of the lots set off to him in the partition. And on the 22d of July, 1846, Mrs. Freeland released and

quit-claimed to him all her right and claim to and upon the residue of the lands set off to him in such partition, except lot No. 1, and also all claim upon the 95 acres of the Ancram farm west of the creek. He had also paid and satisfied her for the arrears of her dower annuity charged upon his share of the premises set off to him in the partition, and for one-third of that eighth of the annuity which, by the decree, was charged upon the three shares allotted to Herman Livingston, A. Bogardus and wife, J. S. Talbot and wife, the Ancram iron works and 70 acres of land at and adjoining the same, the 95 acres of the Ancram farm west of the creek, and upon the interest which the testator had in the Salisbury ore beds at the time of his death.

On the 3d of February, 1845, Stephen Gunn, the mortgagee of A. Bogardus and wife, claimed that his mortgage was a lien upon their interest in the one-third of the 95 acres of the Ancram farm west of the creek, which they conveyed to Herman Livingston. Gunn thereupon received payment, from the latter, of the purchase money which was still due to Bogardus, on account of that conveyance, and released that 95 acres of the Ancram farm from the lien of his mortgage, and agreed to indemnify Herman Livingston against any claim on account of the payment of such purchase money to him.

On the 5th of February, 1845, a decree of foreclosure was obtained by Gunn, upon a bill filed by him against A. Bogardus and wife, for the foreclosure of the two mortgages before mentioned; which decree authorized a sale of the thirteen lots, constituting share No. 5 in the partition suit, that were by the decree in this suit assigned to A. Bogardus and wife, in severalty, as her one-seventh of the lands which were partitioned. The decree of foreclosure also authorized the sale of the whole of those thirteen lots for the payment of the aggregate amount reported due upon both mortgages. And on the 26th of March, 1845, all of the lots composing share No. 5, except lot No. 90, were sold and conveyed, by the master, under the decree, to S. Gunn, the complainant in the foreclosure suit, for $14,050; leaving a balance of about $6000 still due upon the decree

On the 1st of September in the same year, Gunn conveyed to Maria S. Bogardus, the mother of A. Bogardus, the whole of share number five, except lot No. 59, and three acres of lot No. 40 and twelve acres of lot No. 42, which he had previously conveyed to others; and he at the same time assigned to her the decree of foreclosure. The same day A. Bogardus and wife gave to his mother a quit-claim deed of all their interest in share No. 5. And at the same time A. Bogardus conveyed to his mother all his interest in the Salisbury ore beds, for the price or consideration of $2500.

J. S. Talbot, previous to the presenting of the petition, had sold and conveyed all his interest in the lands mentioned in the deed of July, 1843, except the Salisbury ore beds; and had paid to Mrs. Freeland his one-third of the one-eighth of the arrears of the annuity which was charged jointly upon the lands assigned to his wife and to Mrs. Bogardus and to Herman Livingston respectively, and upon the Ancram iron works and the 95 acres of the Ancram farm west of the creek, and upon the Salisbury ore beds. And Mrs. Freeland thereupon had released the lots composing the share of Mrs. Talbot in the partition, or some of them, from the lien of that eighth of her dower annuity.

The other third of that eighth of the annuity not having been paid, Mrs. Freeland presented her petition to the vice chancellor for the sale of the property charged with the payment thereof, and which she had not released, or of so much thereof as might be necessary to satisfy the arrears of the annuity so remaining due. And a reference was directed to a master, to ascertain the amount due upon that portion of her annuity charged as and for the share of Henry Livingston, and the present value of that portion of the annuity upon the principle of life annuities; and to ascertain and report what part of the real estate that portion of the annuity which was then due or which might thereafter become due was chargeable by the decree in this cause, and the order in which the same should be sold. The master reported that Herman Livingston had paid one-third of that eighth of the annuity, and J. S. Talbot had paid another third thereof, and that there was due and payable for the prin-

cipal and interest of the remaining one-third $246,44, at the date of the report; and that the present value of the said one-third, which would thereafter become due, upon the principle of life annuities, was $579,56. He further reported, that the share of the Salisbury ore beds which A. Bogardus acquired by the conveyance from Henry Livingston, and the lands set off to A. Bogardus and wife, under the decree in this cause, as share No. 5, should be sold to pay the amount reported due, and to pay the present value of that third of that portion of the annuity hereafter to become due. But as his interest in the Salisbury ore beds, which was first chargeable, was out of the jurisdiction of the court, being in another state, that lot No. 90 of share No. 5 should first be sold; and after that, the remaining lots of share No. 5, which had all been alienated at the same time and by the same conveyance.

Maria S. Bogardus excepted to the report, because the master had not stated all the property upon which the dower annuity in question was chargeable by the decree; because he had not stated that share No. 3, allotted to Herman Livingston, was properly chargeable with the payment of such dower annuity; because he had not stated that share No. 1, allotted to Talbot and wife, was properly chargeable with the payment thereof; because he had not stated that the Ancram iron works, and 70 acres at and about the same, and the 95 acres of the Ancram farm west of the creek, were properly chargeable with the payment thereof; because the master had reported that the present value of one-third of the annuity charged as and for the share of Henry Livingston was $579,56; because he had stated that the interest acquired by A. Bogardus in the Salisbury ore beds should be sold to pay the amount of that portion of the annuity; because he had stated that share No. 5, allotted to A. Bogardus and wife, should be sold to pay that portion of the annuity due or to become due; because he had reported that lot No. 90 of that share should first be sold, and the residue of that share should secondly be sold; because he had not reported that the Ancram iron works and the 70 acres at and around the same should first be sold, and the 95 acres of the Ancram

farm west of the creek should be secondly sold; and because the master had not reported that Mrs. Freeland had released the 95 acres of the Ancram farm west of the creek, and certain lots allotted to Herman Livingston in the partition, and that thereby the share No. 5, allotted to Bogardus and wife, was absolutely released and discharged of the lien and payment of the part of the annuity in question. The vice chancellor over-ruled all the exceptions, with costs.

*M. Pechtel*, for the appellant.

*J. W. Fairfield*, for Ann Eliza Freeland.

*C. L. Monell*, for Herman Livingston, and for Shafer, Hall & Tanner, the owners of the Ancram iron works and the 70 acres at and around the same.

THE CHANCELLOR. The objection that the master has not stated in his report all the property upon which the part of the annuity in question in this case is chargeable, by the decree, is one in which the appellant has no interest, if the master is right in supposing that the lands and premises now belonging to her are primarily liable for the payment of that part of the annuity. As I understand the case, Herman Livingston has satisfied one-third of this eighth of the annuity; and has obtained a release from Mrs. Freeland for all the lands belonging to him at the time of the decree of November, 1844, upon which that eighth of the annuity was charged by that decree; except certain lands which he had conveyed to others previous to such release, and lot No. 1 of his share. Talbot's affidavit also shows that he has paid another third of that eighth of the annuity, and has conveyed all the lands in this state which were included in the deed of July, 1843. The contest between the parties, therefore, is as to which property shall be charged with the remaining third of that eighth of the annuity. And if the lands which originally belonged to Mrs. A. Bogardus, under the will of her father, did not now belong to the same person

who owns the husband's share of the property which was purchased from Henry Livingston the younger, or enough thereof to satisfy the whole of that portion of the annuity, there might be some difficulty in sustaining the master's report.

The decree of the first of November, 1844, does not profess to designate the order in which the lands that, by such decree, were left subject to the lien of the eighth part of the widow's annuity thereon, as and for Henry's share of such annuity, shall be charged. It is necessary, therefore, to inquire what were the equitable rights of the parties, at the time of the making of that decree. The share of Henry Livingston the younger originally was all primarily chargeable with this portion of the dower of his mother. But in the arrangement of July, 1843, he conveyed to Herman Livingston and to his two brothers-in-law, Bogardus and Talbot, all the lands specifically devised to him, except the homestead and Monell farms, and they gave back to him a mortgage for $7000 upon the Ancram iron works and 70 acres of the Ancram farm around such works. And it appears by the recitals in the decree, that the grantees in that conveyance covenanted to indemnify the grantor against the debts, and to perform all the obligations imposed upon him by reason of his being named as a devisee of a specific portion of his father's estate. This of course included an obligation to discharge him, and the two farms which were left to him, of the annuity which by a previous decree had been charged upon him and his estate. It is true, the charge of the mother upon his two farms was not released by this arrangement; but that part of his share of the devised estate which was granted to his brother and his two brothers-in-law became, in equity, primarily chargeable with the payment of his share of the annuity. And as between the Ancram iron works and the 70 acres of the Ancram farm which they mortgaged to him at the time of his conveyance to them, and the residue of the lands granted to them, such residue was equitably chargeable with the whole of his share of the annuity; as the primary fund for the payment thereof.

Again; the same grantees and their wives, a few months afterwards, made an absolute conveyance, to Henry Livingston

the younger, of the Ancram iron works and the 70 acres adjoining the same; with full covenants of warranty and of seisin, and against all incumbrances thereon.   That conveyance, therefore, independent of the equity acquired under the $7000 mortgage, gave to the grantee therein, and his assigns, an unquestionable equity to have the eighth of the annuity originally chargeable on the whole of the lands devised to him, charged primarily upon the other lands conveyed to Bogardus, Talbot, and Herman Livingston, in July, 1843.   But as Talbot and Bogardus had conveyed two-thirds of the 95 acres of the Ancram farm to Herman Livingston, with warranty, their two-thirds of the coal lands and of the testator's original interest in the Salisbury ore beds became primarily chargeable with the whole of their two-thirds of that eighth of the annuity.   And as Herman Livingston had conveyed his interest in the Salisbury ore beds to Chittenden, his third of the coal lands and his interest in the 95 acres of the Ancram farm, were primarily liable for the payment of his one-third of this eighth of the annuity.   The mortgage from Bogardus and wife to Gunn was prior in date to the deed from Herman Livingston and his two brothers-in-law to his brother Henry.   But inasmuch as it embraced other lands besides the interest which Bogardus acquired, under the deed of July, 1843, in the coal lands, and in the Ancram iron works and the Ancram farm, such other lands were primarily liable in equity for the payment of that mortgage; before resort could be had to the Ancram iron works and the 70 acres around the same, or the 95 acres of the Ancram farm, which the mortgagors had subsequently conveyed, with warranty.   Such were the equities of the several parties, interested in the lands upon which Henry Livingston's eighth of the annuity was chargeable, at the time the final decree in the partition suit was made, in November, 1844.   That decree, however, not only changed the title to the coal lands previously owned by Herman Livingston and his two brothers-in-law, as tenants in common, by assigning portions thereof to other members of the family of Henry Livingston deceased, and giving the wives of Bogardus and Talbot interests in such lands, but it also charged this eighth

of the annuity upon other lands set off to Herman Livingston in his own right, and to Bogardus and Talbot in right of their respective wives. In doing this, however, no injustice was done to the wives of Bogardus and Talbot, or to the mortgagees to whom Bogardus and wife had mortgaged seven-eighths of their interest in subdivision No. 1 in great lot No. 3, in November, 1838. For the lands set off to Mrs. Bogardus, and to Mrs. Talbot, respectively, in severalty, including a share of the 4312 acres of the coal lands, were much more valuable than their shares of the lands as originally devised to them by the will of their father. These coal lands, as proved by the testimony of Augustus Tremain before the master, were worth, on an average, from eighteen to twenty dollars an acre. This, at the lowest estimate of the witness, would increase the value of each share about $11,000. For by the will of the testator the excess in the value of the lands devised to Henry was not to be made up to the other devisees in land; but was to be paid to the executors in money, for the use of such devisees. It was therefore personal estate, which belonged to the husbands of Mrs. Bogardus and Mrs. Talbot, by virtue of their marital rights, and was not subject to the lien of the mortgage to Meseck and Best. The increased value of the lands which were assigned to the shares of Mrs. Bogardus and Mrs. Talbot, in the partition, was therefore much more than an equivalent to them, and to Meseck and Best the mortgagees, for the two-thirds of Henry Livingston's eighth of the annuity; which by the decree were charged upon the whole shares of the estate assigned to Mrs. Bogardus and Mrs. Talbot in severalty, as well as upon the lands and property embraced in the deed, to their husbands and their brother Herman, of July, 1843. It is therefore perfectly equitable and just that the lands thus assigned to these two ladies, in the partition suit, should bear the charge of this part of the annuity, instead of the Ancram iron works and the 70 acres of land connected therewith; which had been previously conveyed to Henry Livingston with full covenants of warranty and seisin and against all incumbrances thereon.

Livingston v. Freeland.

Had it not been for this increase in the value of the real estate assigned to Mrs. Bogardus and Mrs. Talbot, the one-third of the coal lands and one-third of the testator's share of the Salisbury ore beds, which Bogardus acquired under the deed of July, 1843, would, in equity, have been first chargeable with his third of this eighth of the annuity, and the one-third of the same property which Talbot acquired, by that deed, would have been primarily chargeable with his third of this eighth of the annuity. And these would have constituted an ample fund to satisfy these portions of the annuity, in addition to Stephen Gunn's mortgage; which was taken pendente lite, and subject to the third of Henry Livingston's eighth of the annuity which was chargeable upon the part of the mortgaged premises which was embraced by his deed of July, 1843.

The subsequent foreclosure of the two mortgages, in a suit to which neither Mrs. Freeland nor the owners of other lands upon which this part of the annuity was charged, by the decree in partition, were parties, could not divest the equitable lien of Mrs. Freeland upon the premises sold under the decree of foreclosure, nor alter the equitable rights of any of such owners, in reference to the charge of this portion of the annuity. Indeed the decree of foreclosure is entirely erroneous upon its face, so far as respects these equitable rights. For the mortgage to Meseck and Best did not embrace any portion of the coal lands, and only seven-eighths of the original interest of Mrs. Bogardus in the real estate of her deceased father. And yet the decree of foreclosure directs the whole share No. 5 assigned to Mrs. Bogardus in the partition suit, including her share of the coal lands and the whole of her original one-seventh of her father's real estate, which she took under the will, to be sold to satisfy the aggregate amount due upon both mortgages, and the costs and expenses of the foreclosure.

It is not necessary, however, now to inquire what would have been the equities as between Gunn, the holder of the two mortgages, and the respondents in this case, in reference to the lien of Alonzo Bogardus' third of this eighth of the annuity if Gunn had not transferred all his interest in share No. 5 to

Livingston *v.* Freeland.

Maria S. Bogardus, the appellant. For the appellant having become the purchaser of all the interests of A. Bogardus and of his wife, not only in share No. 5, but also in the Salisbury ore bed, which at the time of the conveyance to her was primarily liable for the payment of his third of Henry Livingston's one-eighth of the annuity, she was in equity bound to pay off and discharge that third of this eighth of the annuity, or to appropriate her interest acquired under the deeds of A. Bogardus and wife for that purpose. And no one can doubt that the interest thus acquired by her, under the two deeds of A. Bogardus and wife, of the 1st of September, 1845, was more than sufficient to satisfy his share of this eighth of the annuity, in addition to all prior liens thereon.

It is true the Salisbury ore beds are not within the limits of this state, and therefore could not be sold by a master, under the decree in this cause, so as to transfer the legal title of the appellant to a purchaser. And as Maria S. Bogardus is not one of the parties to this suit, but is merely a purchaser pendente lite, a decree cannot be made upon the petition in this case, under which the reference to the master was ordered, directing her to join with the master in a deed so as to transfer her title to the ore beds to a purchaser under the decree. But her interest in the ore beds being primarily liable in equity for the payment of this third of Henry Livingston's one eighth of the annuity, that interest may be reached, and applied to the satisfaction of this equitable lien thereon, either by an original bill in the state of Connecticut, or by a supplemental bill filed against her here. There is also a lien, however, upon the interest which she acquired under the deed of September 1st, 1845, in share No. 5 of the lands in this state which was assigned to Bogardus and wife under the decree in partition; and that share may be sold under an order to be made upon this petition of Mrs. Freeland which was presented under the provisions of the original decree.

Such being the rights and equities of the parties, it only remains to be seen whether any of the exceptions of the appellant were well taken. As the lands of the appellant were primarily

chargeable with all the arrears of this third of the eighth of the annuity in question, and also with the future payments, she could not object that the master had not reported what lands of other persons were secondarily liable for the payment thereof. The first and second exceptions were therefore properly over-ruled. And it also would have been erroneous for the master to have reported that any portion of the eighth of the dower annuity charged by the decree as and for Henry Livingston's share, whether due or thereafter to become due, was then chargeable upon the lots mentioned in the third and fourth exceptions, other than lot No. 1. For the others of those lots had either been released by Mrs. Freeland, or had been previously conveyed by Herman Livingston ; and were therefore discharged by the release to him of the lots which were first chargeable as between him and his grantees. For this reason, as well as for the reasons given for the disallowance of the previous exceptions, the third and fourth exceptions were not well taken.

The lot No. 1, which was assigned to Herman Livingston by the decree, is undoubtedly chargeable with his third of the eighth of the annuity which constituted the share originally chargeable upon Henry Livingston. And as Mrs. Freeland had released to Herman Livingston a portion of the lots which were primarily chargeable with that third, the lands of the appellant are equitably discharged from the payment of any part of the third which he ought to have paid, even if lot No. 1 should hereafter prove to be insufficient for that purpose. The same may be said in reference to the lands assigned to Talbot and wife in the partition, and which were primarily chargeable with Talbot's third of that eighth of the annuity, if Mrs. Freeland has released any of those lands. But as Talbot, as well as Herman Livingston, had paid up the arrears of their two thirds of this eighth of the annuity, and as the report only professes to state upon what lands the arrears and the future instalments of the other third is chargeable, it is of no consequence to the appellant that the master has not stated that lot No. 1 assigned to Herman Livingston and the several lots assigned

to Talbot and wife are secondarily liable for the third which is primarily chargeable on the appellant's property. The vice chancellor was therefore right in overruling the fifth and sixth exceptions.

The Ancram iron works and the 70 acres at and about the same, having been conveyed by Herman Livingston and by Bogardus and wife, and by Talbot and wife, with full covenants of warranty, long previous to the decree in partition, although as between the owners thereof and Mrs. Freeland, they were still liable to her as a part of the security for Henry Livingston's eighth of the annuity, the grantors in that conveyance were bound to indemnify such owners against this charge upon the lands conveyed. And upon the principle of charging lands, which are subject to an incumbrance thereon, in the inverse order of their alienation, the whole of this eighth of the annuity became primarily chargeable upon the lands embraced in the deed of July, 1843, which remained in the hands of Herman Livingston and Bogardus and Talbot subsequent to their deed of the 18th of November in the same year, to Henry Livingston. And Mrs. Freeland having released a portion of the lands thus primarily liable, with full knowledge of the rights which Henry Livingston and his grantees had acquired under this deed of November, 1843, a court of equity would not now charge any part of the annuity upon the Ancram iron works and the 70 acres adjoining the same; even if the shares of Bogardus and Talbot in the Salisbury ore bed, and the other lands set off to Herman Livingston and Bogardus and wife and Talbot and wife in the partition, which were primarily liable and which have not been released, should prove to be insufficient for the purpose of satisfying the charge. The seventh and eighth exceptions were therefore rightfully disallowed by the vice chancellor.

As the petitioner sought a sale of the lands and premises upon which the arrears of the annuity were properly chargeable, it became necessary to ascertain the value of the future instalments of the same share of the annuity; so that if a sale took place the proper directions might be given to retain the present

value of the future instalments, out of the proceeds of the sale. And it was for the interest of the appellant to have the amount ascertained; so that if Mrs. Freeland consented to accept it in lieu of this portion of her annuity, the property of the appellant which is primarily liable for this part of the annuity might be discharged, without the expense of a further reference to ascertain the amount. The master also obeyed the order of reference in making that part of his report. The ninth exception was of course not well taken.

From what has been before said, it is evident the master was right in reporting that the interest which the appellant acquired of Bogardus and wife, in the Salisbury ore beds, ought to be sold to pay the amount reported due, if the same could be properly sold under the decree here; but as that could not be done, that the share No. 5, in Ancram, set off to Bogardus and his wife in the partition, should be sold for that purpose. The tenth and eleventh exceptions were therefore properly overruled.

As the whole of the arrears of the annuity are primarily chargeable upon the lands, and the interest in the ore beds, conveyed to the appellant, by A. Bogardus and wife, on the first of of September, 1845, it was not very material to her what part of her property upon which these arrears were chargeable, was sold first. But I think the master decided right that lot No. 90, of share No. 5, which had not been affected by the sale under the decree of foreclosure, should be first sold; and then the residue of that share. The report does not mean that all the residue should be put up together and sold in one parcel; but that, as it was all conveyed at one time and to the same person, there is no reason why one separate lot or parcel embraced in that share should be sold in preference to another. In case a sale is directed, the decretal order will of course direct it to be sold in parcels; so that no more shall be sold than will be sufficient to pay the charges thereon for which the whole is primarily liable. The twelfth and thirteenth exceptions were therefore not well taken. And for the reasons before given in reference to the seventh and eighth exceptions, the fourteenth was properly overruled. Nor could the 95 acres of the Ancram

farm which had been released by Mrs. Freeland be sold undo'r the decree ; and the fifteenth exception of course was not well taken.

There was nothing in the order of reference requiring the master to report what lands had been released by Mrs. Free-land to Herman Livingston. That was a mere matter of evidence before the master, to enable him to decide properly as to the matters referred to him. Nor did that release have the effect to discharge the property of the appellant from its primary liability for the payment of the one-third of the eighth of the annuity which was in controversy before the master, upon the reference. The sixteenth and seventeenth exceptions were therefore properly disallowed by the vice chancellor.

The order appealed from was not erroneous in any respect ; and it must be affirmed with costs. The appellant must also pay to Anne Eliza Freeland, one of the respondents, interest on the arrears of the annuity reported due, from the date of the appeal to the 30th of June, 1848 ; as her damages for the delay and vexation caused by this appeal.